UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| LONNIE RAYMOND, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:16-CV-129-PLC |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Lonnie Raymond, Jr. seeks review of the decision of Defendant Deputy Commissioner of Operations, Social Security Administration ("SSA"), Nancy Berryhill, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[1] Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

**I.      Background and Procedural History**

In January 2013, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income claiming he was disabled as of July 2012 as a result of "heart problems" and dyslexia. (Tr. 122-23, 124-28, 172) The SSA denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 64-67, 68-71, 74)

The SSA granted Plaintiff's request for review and conducted a hearing in August 2014. (Tr. 23-60) At the hearing, Plaintiff testified that he was forty-six years old and had a high

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 7).

school education. (Tr. 30) Plaintiff most recently worked in December 2012 as a laborer. (Tr. 29-30).

Plaintiff explained that his heart condition caused "spells," during which his "heart starts feeling like it's got a bunch of butterflies and it's just thumping real fast and, and real hard, and it makes me, it takes my breath away from me." (Tr. 41) Plaintiff stated that these spells lasted anywhere from five minutes to an hour, sometimes caused "real sharp pains in my chest and down my arm," and "make me real weak by the end of it and real tired and sometimes I lay down and sleep a couple hours." (Tr. 41-42)

Plaintiff testified that he did not have a valid driver's license but occasionally drove his friend's car short distances. (Tr. 31-32). He was able to get in and out of the car, buckle his seatbelt, fill the tank, and check the tires, oil, and radiator fluid. (Tr. 36) Plaintiff stated that he did "not really" have problems sitting and "usually [did not] have too much trouble standing." (Tr. 33) Plaintiff was able to cook meals, clean floors, wash dishes at his own pace, carry a gallon of milk from the fridge to the table, and walk about half a mile. (Tr. 34-35, 43, 47) Plaintiff explained that, "[d]epend[ing] on how strong the spell is, if it makes me dizzy or not," he might have to stop his activities. (Tr. 44) Occasionally "these spells" occurred while Plaintiff was "just sitting down" or sleeping. (Id.) The day before the hearing, Plaintiff "moved a four by eight sheet of plywood" and "hung it on the wall," but "it sent me into a spell." (Tr. 33)

In response to questions about his medical noncompliance, Plaintiff explained: "I ran out of money and I ain't got no money and I can't go to the store and get my medicine and then I go without it." (Tr. 37) According to Plaintiff, even when he took his medications as prescribed "[i]t don't totally stop all them spells and stuff, [but] it does keep me out of the hospital for the most part." (Tr. 38) Plaintiff admitted that he smoked one to three cigarettes per day. (Tr. 32)

school education. (Tr. 30) Plaintiff most recently worked in December 2012 as a laborer. (Tr. 29-30).

Plaintiff explained that his heart condition caused "spells," during which his "heart starts feeling like it's got a bunch of butterflies and it's just thumping real fast and, and real hard, and it makes me, it takes my breath away from me." (Tr. 41) Plaintiff stated that these spells lasted anywhere from five minutes to an hour, sometimes caused "real sharp pains in my chest and down my arm," and "make me real weak by the end of it and real tired and sometimes I lay down and sleep a couple hours." (Tr. 41-42)

Plaintiff testified that he did not have a valid driver's license but occasionally drove his friend's car short distances. (Tr. 31-32). He was able to get in and out of the car, buckle his seatbelt, fill the tank, and check the tires, oil, and radiator fluid. (Tr. 36) Plaintiff stated that he did "not really" have problems sitting and "usually [did not] have too much trouble standing." (Tr. 33) Plaintiff was able to cook meals, clean floors, wash dishes at his own pace, carry a gallon of milk from the fridge to the table, and walk about half a mile. (Tr. 34-35, 43, 47) Plaintiff explained that, "[d]epend[ing] on how strong the spell is, if it makes me dizzy or not," he might have to stop his activities. (Tr. 44) Occasionally "these spells" occurred while Plaintiff was "just sitting down" or sleeping. (Id.) The day before the hearing, Plaintiff "moved a four by eight sheet of plywood" and "hung it on the wall," but "it sent me into a spell." (Tr. 33)

In response to questions about his medical noncompliance, Plaintiff explained: "I ran out of money and I ain't got no money and I can't go to the store and get my medicine and then I go without it." (Tr. 37) According to Plaintiff, even when he took his medications as prescribed "[i]t don't totally stop all them spells and stuff, [but] it does keep me out of the hospital for the most part." (Tr. 38) Plaintiff admitted that he smoked one to three cigarettes per day. (Tr. 32)

A vocational expert also testified at the hearing. (Tr. 51) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who was able to perform sedentary work with the following limitations: "lift, carry, push, pull 10 pounds occasionally, less than 10 pounds occasionally"; "sit for six out of eight hours and stand and walk two out of eight hours each [workday]"; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. (Tr. 52-53) The ALJ added that the hypothetical individual could tolerate moderate exposure to pulmonary irritants, but no exposure to extreme heat, cold, humidity, or hazardous conditions, and he required a "reduced stress work environment[.]" (Tr. 53) The vocational expert testified that such individual could not perform Plaintiff's past relevant work, but could perform the jobs of assembly worker, telemarketer, or cashier. (Tr. 53-54) When the ALJ added to the hypothetical the need to take additional breaks, leave early, or arrive late, the vocational expert opined that that the individual would not be able to maintain employment. (Tr. 55-56)

In a decision dated October 2014, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 and found that Plaintiff had the severe impairments of: supraventricular tachycardia, atrial fibrillation, non-occlusive coronary artery disease, hypertension, obesity, and tobacco abuse. (Tr. 14) Additionally, the ALJ determined that no medical evidence supported Plaintiff's alleged dyslexia and Plaintiff's anxiety and history of marijuana abuse were non-severe impairments. (Id.) At step three of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15)

After thoroughly reviewing Plaintiff's testimony and medical records, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 16) The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following limitations:

> [H]e can only occasionally stoop, kneel, crouch, crawl, or climb ramps or stairs. He cannot climb ladders, ropes, or scaffolds. He can tolerate only moderate exposure to pulmonary irritants such as dust, odors, fumes, gases, and poor ventilation. He cannot tolerate exposure to extreme heat, cold, or humidity. He must avoid the hazards of dangerous unprotected heights or machinery. Due to his heart condition, he also requires a reduced stress work environment defined as having to make only occasional commensurate decisions and involving no more than occasional changes in routine and in a normal work setting.

(Tr. 15) At steps four and five of the sequential evaluation, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that exist in significant numbers in the national economy. (Tr. 18-19) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 19)

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6, 7-8) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as Defendant's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.  Standard of Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d

1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III.     Discussion

Plaintiff claims the ALJ erred in formulating his RFC because the ALJ did not include sufficient limitations for Plaintiff's supraventricular tachycardia and atrial fibrillation. (ECF No. 12 at 8)  More specifically, Plaintiff contends that the ALJ erred in failing to include in the RFC assessment limitations for "unscheduled, excessive breaks or absences."  Defendant counters that substantial evidence supported the ALJ's determination of Plaintiff's RFC. (ECF No. 17 at 12).

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th

Cir. 2004). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

In support of his alleged need for an absenteeism limitation, Plaintiff cites his own testimony that his heart conditions caused him to suffer "spells" lasting anywhere from five minutes to an hour. However, the ALJ discounted Plaintiff's complaints, finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible[.]" Plaintiff does not contest that determination here. See, e.g., Jeffries v. Berryhill, 2017 WL 365439, at *5-6 (E.D. Mo. 2017).

Plaintiff presented no medical opinion evidence supporting the need for excessive breaks or absences. In fact, as the ALJ noted in his decision, the record contained "no State agency reviewing physician opinion or treating or examining medical source opinion regarding any specific functional limitations." (Tr. 17) Nor did any doctors place restrictions on Plaintiff's activities. As previously stated, the claimant has the burden of proving his or her limitations. Goff, 421 F.3d at 793 (claimant bears the burden of demonstrating RFC limitations). Plaintiff failed to carry that burden here.

Moreover, the record as a whole contained substantial evidence to support the ALJ's determination that Plaintiff was capable of performing sedentary work, with some restrictions that did not include unscheduled breaks or absenteeism. See, e.g., Miller v. Berryhill, 2017 WL 3642035, at *7 (E.D. Mo. 2017); Eberhart v. Colvin, No. 4:13-CV-940-CDP, 2014 WL 3956480,

6

at *13-14 (E.D. Mo. Aug. 13, 2014). Plaintiff's medical records reveal that he presented to the emergency room in December 2012 with shortness of breath and palpitations. (ECF No. 345, 349) Doctors performed a cardiac catheterization and prescribed sotalol, aspirin, and Xanax. (Tr. 346) Plaintiff returned to the emergency room in January 2013, with chest pain, palpitations, and shortness of breath. (Tr. 333-34) Doctors diagnosed him with paroxysmal supraventricular tachycardia and noted that he had not been taking his sotalol as prescribed. (Tr. 338)

In Spring 2013, Plaintiff continued to experience "breakthrough symptoms," or "episodes of rapid ventricular response." (Tr. 380, 409) In June 2013, Plaintiff returned to the emergency room with shortness of breath, chest pain, and palpitations. (Tr. 390) Doctors attributed Plaintiff's paroxysmal atrial fibrillation to noncompliance with his sotalol regimen, and noted that Plaintiff's symptoms resolved with the administration of his medications. (Id.) When Plaintiff followed up with his cardiologist in August 2013, she observed that Plaintiff was "noncompliant with medications related to financial issues." (Tr. 408) That month, Plaintiff underwent a cryo-balloon ablation and, in October 2013, Plaintiff underwent another ablation and placement of a loop recorder. (Tr.407, 444)

In February 2014, Plaintiff continued experiencing "recurrent episodes of atrial fibrillation documented through his loop recorder despite ongoing anti-arrhythmic drug therapy." (Tr. 413) The following month, Plaintiff's cardiologist performed a "redo radiofrequency-based pulmonary vein isolation procedure." (Tr. 414, 444, 447) Plaintiff subsequently reported "doing fairly well, with a couple breakthrough episodes of atrial fibrillations since his procedures, but overall feels his arrhythmia burden is diminished." (Tr. 411)

Plaintiff presented to the emergency room with chest pains in May 2014 because he had not taken his sotalol in one week. (Tr. 418-20). His medical records reflect that his chest pain "completely resolved" after he received sublingual nitroglycerin. (Tr. 421) At a follow-up appointment with his cardiologist in July 2014, Plaintiff reported "ongoing episodes of symptomatic palpitations," and the cardiologist adjusted his medications. (Tr. 440-41)

After reviewing Plaintiff's medical records, the ALJ observed that Plaintiff's medical treatment was "irregular" and often necessitated by his medical noncompliance. (Tr. 17). The ALJ stated that "[w]ith medical compliance, [Plaintiff] admits to improved health and remains stable . . . ." "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1993)).

The ALJ also noted that Plaintiff "remains active, admitting to no limitations with sitting and little difficulty with standing." (Tr. 18) Indeed, Plaintiff testified at the hearing that he drove short distances, cooked meals, washed dishes, vacuumed and/or swept floors, and was able to lift and carry a gallon of milk. (Tr. 32, 34-35) In his function report, Plaintiff stated that the only activities limited by his impairments were walking and climbing stairs, and he regularly ran errands and visited family members. (Tr. 191, 195) Plaintiff's activities of daily living supported the ALJ's finding that he could perform a limited range of sedentary work. They did not support additional limitations for frequent breaks or absenteeism. See e.g., Pendergrass v. Colvin, No. 4:15-CV-974 NAB, 2016 WL 4206010, at *5 (E.D. Mo. Aug. 10, 2016).

In support of his position that the ALJ erred in failing to include in the RFC limitations for Plaintiff's "periods of decreased functioning," Plaintiff cites Nowling v. Colvin, 813 F.3d 1110 (8th Cir. 2016). There, the Eighth Circuit reversed and remanded an ALJ's finding that the

plaintiff, who suffered from "conversion disorder manifesting itself as somatoform, non-epileptic 'pseudo-seizures,'" as well as obesity, migraine headaches, mood disorder, anxiety disorder, and personality disorder, was not disabled. 813 F.3d at 1113. The Nowling court held that the ALJ erred in discrediting Plaintiff's subjective complaints without either explaining "how extensive he determined [the plaintiff's] symptoms to be" or addressing "the effect of her conversion disorder upon her perception of her own symptoms[.]" Id. at 1120. The Eighth Circuit reversed and remanded the case because, in the "context of this uncertainty" surrounding the ALJ's credibility assessment, the ALJ also failed to address the testimony of the plaintiff's relative and discounted the opinions of her treating physician and social worker. Id. at 1120, 1122-23.

Unlike the plaintiff in Nowling, Plaintiff does not challenge the ALJ's finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." More significantly, Plaintiff's case differs from Nowling in that no medical provider identified Plaintiff's impairment as causing disabling symptoms or restricted his activities. See e.g., McRoberts v. Berryhill, 2018 WL 2335746, at 7-8 (E.D. Mo. 2018). In the instant case, the ALJ did not err in excluding without explanation a limitation for excessive breaks and absenteeism because Plaintiff presented no evidence that he required such an accommodation.

To the extent that Plaintiff argues the ALJ erred in failing to explain why he did not include limitations for breaks and absences, such failure does not require reversal and remand because substantial evidence supported the ALJ's RFC determination. See Welch v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014) (ALJ's failure to address SSR 96-9p was an arguable deficiency in opinion writing that had no practical effect on the decision); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a

sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.")

**IV.     Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

                                                                         PATRICIA L. COHEN
                                                                         UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of September, 2018